USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/24/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PASQUALE TRAMONTANA,

                     Plaintiff,

-against-

HOME DEPOT U.S.A., INC., TRICAM
INDUSTRIES, INC., and GORILLA LADDERS,

                     Defendants.

15-CV-8528 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiff Pasquale Tramontana ("Plaintiff") initiated this diversity action in the Supreme Court of the State of New York, County of Sullivan, which was removed to this Court on October 30, 2015 by Defendants Gorilla Ladders, Tricam Industries, Inc. ("Tricam"), and Home Depot U.S.A., Inc. ("Home Depot") (collectively, "Defendants"). (*See* ECF No. 1.) Plaintiff's claims sound in product liability insofar as Plaintiff alleges that he suffered serious personal injuries as a result of a manufacturing defect in a Gorilla Ladder model #AL-22-02. (*Id.*) Presently before the Court is Defendants' motion to exclude the testimony of Plaintiff's expert, James Pugh and for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Defendants' Motion"). (*See* Defendants' Brief in Support of their Motion ("Defs. Br.") (ECF No. 34).) For the following reasons, Defendants' Motion is GRANTED.

## FACTUAL BACKGROUND

All facts are taken from the Defendants' Rule 56.1 Statement of Undisputed Material Facts ("Defs. 56.1") (ECF No. 38), Plaintiff's Rule 56.1 Statement of Undisputed Material Facts ("Plf. 56.1") (ECF No. 39), and a review of the record.

Plaintiff alleges that a manufacturing defect in the "J" hooks of the Gorilla Articulating Ladder, model number AL-22-02 ("Model AL-22"), caused his injuries.[1] Specifically, he contends that the "J" hooks connected to the ladder used by his son Paul Tramontana ("Paul") on August 18, 2013 (the "Ladder")[2] were defectively manufactured and therefore more susceptible to fracture, causing the Ladder to buckle and his son to crash into the Ladder and then into him. (*See* Plaintiff's Brief in Opposition to Defendants' Motion ("Plf. Br.") (ECF No. 36) ¶¶4-5.) The Ladder was manufactured in September of 2008 and, as with most articulating ladders, had three parts: (1) an articulating joint (referred to by the parties as a "center section"); (2) two side rails (referred to by the parties as "flared sections"); and (3) two "J" hooks.[3] (*See* Plf. Resp. ¶1.) In its un-extended form, the Ladder appeared as follows:

---

[1] An articulating ladder is a "portable ladder with one or more pairs of locking articulated joints which allow the ladder to be set up in several modes such as a straight or extension ladder, with or without a stand-off, as a regular or double front stepladder, scaffold or work table." (*See* Affidavit of David M. Pollack in Support of Defendants' Motion ("Pollack Aff.") (ECF No. 33), Ex. 15 (American National Standard for Ladders – Safety Requirements ("ANSI Manual") at 2.)

An articulating joint is "a hinge which can be locked in one or more positions." *Id.* The articulating "joints, and the joint side rail connections, shall be so constructed as to ensure sufficient strength and rigidity to conform to the requirements of th[e testing] standard. The joint shall have set locking positions to allow set up at the proper angels designated by the manufacturer." (*Id.* at 10.)

Considering the foregoing, it is apparent that articulating ladders contain three main component parts: (1) the articulating joint which contains two movable rails connected by a center hinge; (2) one or more side rail connectors that lock into place along the articulating joint and can be adjusted up or down to extend the length of the ladder; and (3) the locks, or "J" hooks that connect the side rails to the articulating joint. The articulating joint can also be manipulated such that it can be adjusted and locked into several different angles.

[2] For clarity, the Court refers to the Model AL-22 Gorilla ladder used by Paul as the "Ladder" and otherwise generally references the Gorilla Model AL-22 ladder as "Model AL-22."

[3] The "J" hooks are metal pieces that are used to connect the side rails to the articulating joint. The parties and their experts refer to these pieces interchangeably as "pins", "locks", and "J" hooks. For ease of reference, and for purposes of this Opinion, the Court will refer to them as "J" hooks.

 

(*See* Affidavit of David M. Pollack in Support of Defendants' Motion ("Pollack Aff.") (ECF No. 33), Ex. S at 4.) Though the quality of the photograph is lacking, it is nevertheless evident that this photo contains a complete articulating ladder, the central portion of which is the articulating hinge and two side rails (the outer flared legs which are attached by "J" hooks).

Though there is a dispute about whether or not the Ladder was tested for safety post-manufacturing and prior to sale, the parties do not dispute that the lot of Model AL-22's manufactured at the same time as the Ladder in question, met the testing requirements of the American National Standard for Ladders A14.2 ("ANSI") and the Occupational Safety and Health Administration standard 1926.1053, "including the inclined load test, the single lock load test[,] and the step to side rail shear test." (*See* Plf. Resp. ¶¶2, 4.)

On the date of the accident, Plaintiff and Paul were asked to replace several shingles on the roof of Plaintiff's sister's garage. (*See* Pollack Aff., Ex. V. at 6-7.) Paul testified that he was familiar with articulating ladders and knew how to operate them, but had not used this particular Ladder in the past. (*See* Pollack Aff., Ex. V at 6, 9.) He took it upon himself to construct the Ladder and when asked during his deposition, confirmed that he did so by inserting the "J" hooks

through the holes located on the side rails into a "mating portion"[4] to ensure that the ladder would remain locked as extended in the appropriate position. (*See* Plf. Resp. ¶22.) Despite the fact that this testimony appears to indicate that Paul attached the side rails to the articulating joint, he later confirmed that the only ladder pieces he used are depicted below:



(Pollack Aff., Ex. E.) Paul testified that he connected the top portion of "Section A" (as marked above) to the top portion of "Section B" (as marked above) by locking the "J" hooks into each section. (*See* Plf. Resp. ¶22.) Moreover, Paul explicitly denied using the articulating joint to construct the Ladder. (*Id.* ¶23.) Whether or not such construction is possible is disputed by the parties, however, it is evident that, according to Paul, he only used the side rails and "J" hooks to fashion the Ladder he used that day.

Plaintiff braced the bottom of the Ladder with his foot, while Paul climbed up toward the roof. (*See* Pollack Aff., Ex. V at 12-14.) At the moment of the accident, Paul contends that he had almost reached the roof, as his chest was parallel to the rain gutter, but he was not in the

---

[4] Neither party defines "mating portion." The only time the term appears is in Defense counsel's questioning of Paul during his deposition and the Rule 56.1 citations thereto. (*See* Pollack Aff., Ex. V at 28; Plf. Resp. ¶22.) Read in context, however, it appears that "mating portion" refers to the articulating joint.

4

process of stepping off of the Ladder onto the roof and, instead, both of his feet were on one rung of the Ladder. (*Id.* ¶¶30-34.) Nevertheless, in his answers to interrogatories, Paul admitted that he "was stepping onto the garage roof" at the time of the accident. (*Id.* ¶50.) Paul recalls that he fell backwards and heard a crash, his body struck the ladder, and then both he and the Ladder struck Plaintiff. (*Id.* ¶¶34-38.)

Paul did not recall hearing "ladder breakage" before his fall, and shortly thereafter, two sections of the Ladder were lying on the ground (as depicted in Exhibit E above). (*Id.* ¶¶39-40.) Paul also found two fractured "J" hooks near the broken Ladder. (*Id.* ¶41.)

Plaintiff hired James W. Pugh, P.E. to render an expert opinion in this case. Pugh is the director at Inter-City Testing & Consulting Corporation, in the division of Biomedical Engineering/Metallurgy/Materials Science. (*See* Pollack Aff., Ex. 14 ("Pugh's Report") at Curriculum Vitae.) He obtained his PhD in Biomedical Engineering from the Department of Metallurgy and Materials Science at the Massachusetts Institute of Technology in 1972. (*Id.*) In addition to serving as the Director at Inter-City Testing & Consulting Corporation, Pugh is a Professor at the Cooper Union School of Engineering in New York. (*Id.*)

In rendering his opinion, Pugh reviewed the depositions of Plaintiff and Paul, the corporate designee David Simpson, various blueprints, prior claims,[5] test results, the Interrogatories and Answers, Summons and Complaint, medical records and reports, and the relevant photographs. (*Id.* at 1.) In addition, Pugh inspected the Ladder, analyzed the fractured "J" hooks under a microscope, and compared the Ladder to an exemplar Werner ladder.[6] (*Id.*)

---

[5] As revealed by his report, it appears the only knowledge Pugh had with respect to prior claims is that they existed and pertained to the Model AL-22. He does not appear privy to any additional information regarding said claims.
[6] Pugh writes that the Model AL-22 is no longer in production, so he used a comparable articulating ladder by Werner as exemplar to study in rendering his opinion. (*Id.* at 3.)

Pugh opines that "[t]he presence of significant and major casting defects in the ["J" hooks] . . . constitute manufacturing defects." (*Id.* at 3.) Such defects, Pugh opines, are caused by "lack of temperature control in the casting process, impurities, departure from accepted processes in the rate of pouring into the mold, as well as other factors." (*Id.*) Pugh does not describe the standard for manufacturing the "J" hooks or what the final composition should contain chemically and metallurgically. Pugh does indicate that "non-destructive radiography" should have been performed on each and every "J" hook that is manufactured, which radiography would "delineate the porosity in the bulk of the ["J" hooks]", and would be an economically feasible way for the manufacturer to remove defective "J" hooks from production.[7] (*Id.*) Pugh states that such testing is particularly important to ensure quality control, on "[a] critical part such as the cast aluminum ["J" hooks]." (*Id.*) Pugh did not perform his recommended "non-destructive radiography" on the subject "J" hooks, the Werner "J" hooks, or any others to analyze the differences in the porosity levels.

Instead, Pugh examined the broken "J" hooks under a Nikon Steremiscroscope at a magnification up to 30X. (*Id.* at 2.) His examination revealed that the broken "J" hooks had "considerable casting porosity in the broken parts consisting of deep holes throughout the parts," which "essentially reduced the cross-sections of the broken parts and created stress concentrators promotive of breakage." (*Id.*) Pugh described the porosity as "shrinkage pores", though he did not define what that means, or what, if any, significance that had on his conclusion. (*Id.*) Pugh did not intentionally fracture an identical "J" hook to ascertain whether the same levels of porosity existed as did in the fractured "J" hooks. (*Id.*) Pugh further opined that the shape of the "J" hook, insofar as the "fracture surface was contiguous with a sharp right-angle feature", "amplified the

---

[7] Pugh acknowledges, however, that the Model AL-22 did pass the ANSI Standard, but that such standard does not include industrial radiography. (*Id.* at 3.)

6

internal stresses and, in conjunction with the porosity, amplified the stress in the pin to cause the brittle fracture." (*Id.*) Pugh does not describe how or why a sharp right angel compromises the strength and structure of the "J" hook. Pugh further opines that the fractures were "almost entirely brittle" and that, as such, it was clear that the breaks "occurred with minimal energy input or energy absorption, and therefore under low stress and low load conditions." (*Id.*)

Based on Simpson's testimony that there was "three known claims" regarding the Model AL-22, Pugh opined that his analysis "revealed the likelihood that [there] are many more than three claims/lawsuits relating to this ladder, and there is all likelihood, many requests for replacement pins from customers, which when those requests are produced in discovery, would point out that the company had knowledge of the defectiveness of the pins." (*Id.* at 3.) The Court notes that a review of the record reveals that such an opinion is entirely speculative and unsupported by any facts or data.

Pugh examined a Werner Model MT-22 articulating ladder in rendering his opinion. It is his opinion that "the Werner ladder is significantly of higher quality and manufacture, with rounded edges and more robust construction, as compared with the Gorilla ladder which has sharp edges promotive of failure due to stress concentration and of general less-robust construction." (*Id.*) Moreover, he opines that "[t]he ["J" hooks] on the Werner ladder because of their superior robustness are inherently more tolerant of casting defects than the Gorilla ["J" hooks] with their inferior robustness." (*Id.* at 4.) Pugh does not discuss whether the Werner "J" hooks contain any levels of porosity, whatsoever, and what effect, if any, that would have on their susceptibility to fracture.

Finally, Pugh states that "[t]he useage [sic] of the ladder was well within the labeled capacity of the ladder and the permitted configuration of the ladder at the time of the accident",

7

though he fails to provide a summary of his understanding of how Paul constructed and used the ladder. (*Id.* at 4.) Pugh thereafter concludes that the "[m]anufacturing defects in the broken ["J" hooks] consisting of shrinkage porosity caused the collapse of the ladder, which caused Paul Tramontana to fall off the ladder and strike his father Pasquale Tramontana, which caused the injuries sustained by Pasquale Tramontana." (*Id.* at 5.)

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," *see* Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## DISCUSSION

### I. <u>Expert Testimony as to Manufacturing Defect[8]</u>

Defendants' move to exclude the testimony of Pugh as an expert witness insofar as his methodologies and conclusions are unreliable. (*See* Defs. Br. at 2-10.) This Court agrees.

---

[8] Defendants also seek dismissal of the design defect claim alleged in Plaintiff's Complaint. (*See* Defs. Br. at 4-6, 9-10.) Specifically, Defendants argue that Plaintiff must demonstrate that his expert is an articulating ladder design expert and that he failed to provide an alternate design, and therefore must be disqualified as an expert witness. (*Id.*) Plaintiff's opposition clarifies that the only cause of action before the Court is one for product liability on the basis of manufacturing defect, not design defect. (*See* Plf. Br. ¶¶14, 18.) To the extent Plaintiff raised a design defect claim in the Complaint, the Court deems it withdrawn.

A.  **Admissibility of Expert Testimony**

Expert testimony is governed by Federal Rule of Evidence 702 which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In *Daubert*, the Supreme Court held that Rule 702 supersedes the traditional *Frye* rule, which required general acceptance by the scientific community of a theory in order for it to be admissible. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588-89 (1993). It is a trial judge's role to be the "gatekeeper" and determine whether a proffered expert meets the requirements of Rule 702. *Id.* at 589 ("[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."); *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). To do so, a district court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). This obligation exists whether the proffered expert testimony regards "scientific", "technical", or "other specialized" knowledge. *Kumho*, 526 U.S. at 147-48. The district courts are granted great "latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability . . . ." *Id.* at 152.

As to relevance, courts look to Rule 401 to ascertain whether the testimony "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Amorgianos*, 303 F.3d at 265 (quoting *Campbell v. Mero. Prop. & Cans. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (quoting

9

Fed. R. Evid. 401)) (internal alterations omitted). Moreover, "[e]xpert testimony which does not relate to any issue in the case is not relevant, and, ergo, not helpful." *Daubert*, 509 U.S. at 591.

Thereafter, the court must assess whether there is a reliable foundation for the proffered testimony and if it conforms to the Rule 702 factors. *Amorgianos*, 303 F.3d at 265. Such factors include: (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Id.* (quoting Fed. R. Evid. 702).

*Daubert* also articulated factors that bear on the reliability determination. *See Daubert*, 509 U.S. at 593-594. The *Daubert* factors include: (1) "whether a theory or technique can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "a technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation"; and (4) "whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Amorgianos*, 303 F.3d at 266 (quoting *Daubert*, 509 U.S. at 593-594) (internal quotations omitted). Such factors are not exhaustive, nor is this a "definitive checklist or test." *Daubert*, 509 U.S. at 593. Critically, the district court must ascertain whether the testimony is "tied to the facts" of that "particular case." *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 591). The trial court "should [therefore] consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id.* at 152.

The *Daubert* analysis is a fluid one which focuses "solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595. Nevertheless, "conclusions and methodology are not entirely distinct from one another", as "[t]rained experts commonly extrapolate from existing data." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Importantly, neither *Daubert* nor the Federal Rules of Evidence "requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* Where the "analytical gap between the data and the opinion proffered" is "simply too great", a district court can exclude expert testimony. *Id.*; *see also Amorgianos*, 303 F.3d at 266 ("Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.")

### B. Reliability of Pugh's Testimony[9]

"To warrant admissibility, . . . it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. To make this determination, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* Nevertheless, to warrant exclusion, a flaw in the steps of an expert's analysis must be considerable. *Id.* (noting that the flaw should be "large enough that the expert lack's 'good grounds' for his or her conclusions").

There is simply "too great an analytical gap between [Pugh's] data and the opinion proffered." *See Armorgianos*, 303 F.3d at 266 (quoting *Joiner*, 522 U.S. at 146). Though Pugh's Report indicates that he examined the fractured "J" hooks and found "considerable casting porosity", he then simply concludes that such porosity constitutes a defect which caused the fracture, and therefore caused Plaintiff's injuries. Pugh, however, provides no data upon which to rest this conclusion. He fails to illuminate whether porosity at any level is problematic, and if so,

---

[9] Defendants essentially concede the relevance of Pugh's testimony by focusing their arguments on the purported unreliability of his methodologies and conclusions. (*See* Defs. Br. at 5-6 (arguing his is unqualified to render the opinion), 6-7 (arguing unreliability insofar as Pugh's testimony is not tied to the facts), 8-9 (arguing unreliability for lack of testing).)

11

at what point it constitutes a defect. His opinion, therefore, is impermissibly based on his *ipse dixit* alone. *See Russo v. Keough's Turn of the River Hardware, LLC*, No. 11-CV-994 (VB), 2012 WL 4466626, at *4 (S.D.N.Y. Sept. 25, 2012) ("Essentially, Dr. Marletta opines that the non-uniform thickness of the metal ladder rails is a manufacturing defect and caused the ladder's collapse, but provides no reasoning or any point of comparison indicating why the non-uniform thickness constitutes a manufacturing defect. In the absence of any support behind his assumption that the non-uniform thickness constituted a defect, Dr. Marletta's opinion is speculative at best."); *see also Lynch v. Trek Bicycle Corp.*, 374 F. App'x 204, 206-07 (2d Cir. 2010) (summary order) (affirming exclusion of expert testimony where expert's testimony was largely speculative and he failed to test theory of causation ).

Additionally, while Pugh compared the fractured "J" hooks to the ones manufactured by Werner, he merely noted that the Werner hooks were of better quality because they were more robust and therefore "inherently more tolerant of casting defects."[10] (*See* Pugh Report at 4.) Such observations have no connection to porosity, the alleged defect, at all. Indeed, Pugh failed to even intentionally fracture the Werner "J" hooks or examine them under a microscope to ascertain whether they contained any level of porosity. His conclusions that the Werner "J" hooks are superior are based on no data whatsoever and are therefore speculative. *See Macaluso v. Herman Miller, Inc.*, No. 01-CV-11496 (JGK), 2005 WL 563169, at *8 (S.D.N.Y. Mar. 10, 2005) (noting that "without the ability to inspect the original chair, all of Weber's conclusions with respect to

---

[10] Additionally, Pugh's contention that due to the increased robustness of the Werner "J" hooks, the "margin by which the Werner ladder passes the ANSI requirements is therefore much greater than the margin by which the Gorilla ladder passes the ANSI requirements", (*see* Pugh Report at 4), is wholly speculative. Pugh fails to identify the extent to which either ladder passes the ANSI requirements and whether the results of the relevant tests reflect analysis of the "J" hooks of either ladder. Moreover, even if he did provide sufficient data to this point, as the Model AL-22 did pass the ANSI requirements, by whatever margin, such a comparison fails to demonstrate how the Gorilla "J" hooks were defective.

the 'exemplar' chair are speculative because there is no evidence that the exemplar chair had the same condition that caused the actual chair back . . . .").

Simply put, there is no scientific methodology on which Pugh's theory can be tested, despite his contention that a particular radiography exam, which he did not perform, would be able to test for porosity. *See Nook v. Long Island R. Co.*, 190 F. Supp. 2d 639, 642 (S.D.N.Y. 2002) (excluding expert testimony where "[n]o data, testing methodology or empirical evidence is offered to support [expert's] conclusions"). Indeed, his contention that this examination would assist in deciphering which "J" hooks contain impermissible levels of porosity begs the question: what is the acceptable level of porosity in a manufactured "J" hook and at what point does porosity constitute a defect? This critical question remains unanswered.

Otherwise detrimental to Pugh's analysis is his scant overview of the facts of this case and how they pertain to his conclusion. (*See* Pugh Report at 1, 5.) As Defendants point out, Paul testified that he did not use the articulating joint in constructing the Ladder before its use and instead connected the two side rails to one another using "J" hooks. (*See* Plf. Resp. ¶¶22-23.) In a conclusory fashion, Pugh presumptuously asserts that usage "of the ladder was well within the labeled capacity of the ladder and the permitted configuration of the ladder at the time of the accident." (*See* Pugh Report at 4.)

With respect to the conclusion regarding "labeled capacity", Pugh likely determined as much from the fact that Paul testified to being 180 pounds and the weight capacity for the Ladder was noted as being 300 pounds, though he fails to explicitly state as much. As to the construction of the Ladder as detailed by Paul, assuming such construction is possible, Pugh fails to discuss how, if at all, it was in conformity with the normal and intended use of the Ladder, and if not, whether that would impact the "J" hook's susceptibility to failure. Indeed, his recitation of the

facts of this case does not even discuss how Paul constructed the Ladder. (*See* Pugh Report at 1.) Consequently, his methodologies and conclusions cannot be said to be "tied to the facts" of this case, such that they should be considered admissble. *Kumho*, 526 U.S. at 150; *see also Barret v. Black & Decker (U.S.) Inc.*, No. 06-CV-1970 (SCR) (MDF), 2008 WL 5170200, at * (S.D.N.Y. Dec. 9, 2008) ("[T]he undisputed factual disconnect between Mr. Clauser's and Plaintiff's versions of the accident at issue is reason enough to preclude Mr. Clauser's expert testimony.") [11]

In consideration of the fact that Pugh fails to identify any data or scientific methodologies on which to base his conclusions, how such data or methodologies are reliable, and likewise fails to tie his examinations and conclusions to the facts of this case, the Court finds that Pugh's testimony is unreliable and warrants exclusion.

## II. Summary Judgment is Warranted

Defendants also argue that, if this Court excludes Pugh's testimony, it should also grant summary judgment in their favor. (*See* Defs. Br. at 10.)

In light of this Court's determination that Pugh's testimony is unreliable and should be excluded, Plaintiff cannot rely on it in support of a claim for manufacturing defect. Consequently, Plaintiff provides no other evidence,[12] and indeed is unable to do so, demonstrating that the "J" hooks were defective, an essential element of the manufacturing defect cause of action. *See Macaluso*, 2005 WL 563169, at *8 (after exclusion of expert testimony "the plaintiffs have provided no evidence that the chair in which the alleged accident occurred was defective"). As a matter of law, therefore, Plaintiff cannot prove a claim for manufacturing defect. Defendants are

---

[11] Defendants also argue that Pugh's testimony is inadmissible because Plaintiff has failed to demonstrate that he is an articulating ladder reconstruction expert. (*See* Defs. Br. at 5-6.) In light of this Court's determination that Pugh's testimony is wholly unreliable and therefore inadmissible, the Court need not reach the merits of this argument.

[12] Indeed, in light of Paul's admission that he did not use the articulating joint, (*see* Plf. Resp. ¶¶22-23), and instead connected the two side rails by using the "J" hooks, it is more likely that Paul improperly used the Ladder and therefore did not use it as intended.

entitled to summary judgment. *See Hunt v. CNH Am. LLC*, 511 F. App'x 43, 47-48 (2d Cir. 2013) (affirming grant of summary judgment where district court had excluded expert testimony essential to design defect claim).

**CONCLUSION**

For the foregoing reasons, Defendants' Motion is GRANTED. This Court finds Pugh's testimony unreliable and hereby excludes such testimony in its entirety. As Plaintiff must use an expert to support his manufacturing defect claim, and the preclusion of Pugh's testimony renders Plaintiff unable to make out a prima facie case of manufacturing defect, this Court also grants summary judgment to Defendants.

The Clerk of the Court is respectfully directed to enter judgment in Defendants' favor. The Clerk of the Court is further requested to terminate the motion at ECF No. 32 and terminate the action.

Dated: September 24, 2018
       White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge